435 So.2d 1144 (1983)
Soula O'BANNON
v.
Dr. Robert AZAR.
No. CA-0514.
Court of Appeal of Louisiana, Fourth Circuit.
July 8, 1983.
Rehearing Denied August 23, 1983.
*1146 Darleen M. Jacobs, A Professional Law Corporation, New Orleans, for defendant-appellee.
Paula Perrone, A Professional Law Corporation, New Orleans, for plaintiff-appellant.
Before KLEES, AUGUSTINE and LOBRANO, JJ.
KLEES, Judge.
In this paternity action, the plaintiff filed suit to have the defendant declared the natural father of her minor child. In addition, the plaintiff sought child support from the defendant. The trial court held that the defendant was not the father of the child. The plaintiff appeals, contending that the trial court erred in its determination that the defendant was not the father of the child. The plaintiff also asserts that the trial court committed error during the trial when it ruled on certain evidentiary and procedural matters.
In our review of the voluminous record of this case, we conclude that the trial judge did not commit manifest error in his determination of non-paternity. Additionally, we conclude that the trial judge did not commit any reversible errors in his evidentiary rulings. For these reasons, the decision of the trial court is affirmed.

FACTS
The plaintiff and defendant met in 1979 while both were tenants at the Pier Eight Apartments in New Orleans. The record reflects that the parties met primarily in the parking lot grounds of the complex due to the fact that their cars were often parked in close proximity. Both parties admit to these limited facts, however, almost all other facts are in dispute.
Plaintiff testified that she and defendant went out on one date when he escorted her to a Mexican Restaurant in the French Quarter. Furthermore, she alleged that she and the defendant had sexual intercourse in the defendant's apartment on three separate occasions, July 27, 1979, August 3, 1979 and August 21, 1979.
The defendant testified that he knew the plaintiff only as an assistant manager of the apartment complex. He stated that she frequently approached him with gossip concerning other tenants and she also discussed her own personal problems. Defendant denied that he ever went out on a date with plaintiff. Furthermore, he emphatically denied that he ever had sexual intercourse with the plaintiff. In support of this contention, the defendant offered, at trial, the sworn testimony of Dr. John Georgott who stated that the defendant was in San Francisco on July 27, 1979, one of the dates when the alleged sexual intercourse took place.
In addition, defendant argues that he could not possibly father a child due to the fact that he obtained a vasectomy which was performed by a physician and friend, Dr. Sharon West Doud. Defendant asserts that he obtained the vasectomy on April 7, 1979 in Westfield, New York. He explained at trial that he went to Dr. Doud in New York because he had a close personal and professional relationship with her and that he wanted to minimize the chance of anyone obtaining knowledge of the vasectomy.
The fact that defendant was contemplating a vasectomy was verified by Wilson Abraham, a close friend and associate.
Dr. Doud testified that she received a call from defendant in which he indicated that he had separated from his wife and desired a vasectomy. They proceeded to plan the operation for April 7, 1979, during a time when her husband would be away from home. She stated that she performed the vasectomy at her office in her home in Westfield, New York on April 7, 1979.
The seventeen-year-old daughter of Dr. Doud testified via deposition that she saw defendant in her home in New York and that she saw defendant and her mother go into the examining room in her home.
Dr. Bernard Jacobs testified that defendant came to see him on June 6, 1979. At that time, he examined defendant and observed *1147 what appeared to be scars from a vasectomy. He also took a sperm count from him in June and July of 1979. Both counts were negative for sperm. Dr. Jacobs further stated that in his opinion, it was impossible for defendant to father any child due to the vasectomy and negative sperm counts.
The plaintiff questions whether the vasectomy was actually performed in New York at the time stated by defendant. Plaintiff points out that defendant was unable to produce any independent documentary evidence which would substantiate his trip to New York. Plaintiff also produced as a witness Robert Doud, the former husband of Dr. Sharon Doud, who testified that he was at his home in Westfield, New York during the period of time when defendant supposedly had the vasectomy and that defendant did not come to his home to have a vasectomy performed.
The issue of whether or not defendant actually had a vasectomy became relevant in the fall of 1979. At that time, defendant, who had moved from the Pier Eight Apartments, was contacted by plaintiff. She informed him that she was pregnant and claimed that he was the father of the child. When the plaintiff was questioned regarding the reaction of defendant, she testified that he was "dumbfounded".
Subsequent to this incident, defendant had a telephone conversation with Dr. Joseph Bellina, plaintiff's gynecologist. The defendant testified that Dr. Bellina called him. Dr. Bellina could not remember who initiated the call. During the conversation, the general condition of plaintiff was discussed and Dr. Bellina recalled that defendant did not say anything to indicate that he was the father of the child.
On April 21, 1980, plaintiff was admitted to F. Edward Hebert Hospital for delivery. Shortly after the delivery of the child, a birth certificate was issued. On the certificate, the space for the name of the father was left blank. The defendant never signed the infant's birth certificate nor did he pay any medical expenses in connection with the child's birth.
In October of 1980, plaintiff filed a paternity suit. Blood tests were ordered by the court. The interpretation of these tests by the experts called during the trial are directly in conflict. The plaintiff called Dr. Leslie Ray Bryant, Jr., who was accepted by the court as an expert in paternity testing. This court, as did the trial court, notes the impressive credentials of Dr. Bryant as a paternity expert. After analyzing the HLA (Human Leukocyte Antigen) blood test results, Dr. Bryant was able to give the percentage of probability that the defendant is the natural father of the child. Dr. Bryant concluded that the probability of paternity was 99.91 per cent.
Dr. Andrew Hegre was commissioned to perform paternity testing for the defendant. The red blood cell typing showed approximately a 68% probability of paternity. However, according to Dr. Hegre the immunoglobin testing showed exclusion factors which indicated that the defendant could not have fathered the child. Also, Dr. Hegre criticized the accuracy of the HLA test performed by Dr. Bryant.
Plaintiff asserts that due to the 99.91 percent probability of paternity found by Dr. Bryant, the trial court committed manifest error in its determination of non-paternity. We disagree.
If the blood test results are viewed in isolation, this argument might have merit. However, the test results must be weighed along with all other evidence presented at trial.
An obvious assumption underlying the HLA paternity test, or any test for that matter, is that the mother and putative father have engaged in sexual intercourse at least once during the period of possible conception.
Susan Spears, a close friend of the plaintiff, testified that she saw the plaintiff and the defendant talking in the parking lot. Ms. Spears stated that the plaintiff told her that she was going to dinner with the defendant. This is the full extent of her testimony regarding the relationship between the plaintiff and the defendant.
*1148 Gloria Parkam, another friend of the plaintiff, was called to testify. Under cross-examination, she admitted that she had never actually seen the plaintiff and the defendant together.
Chester Booth, a former tenant at the Pier Eight Apartments, testified that he knew both the plaintiff and the defendant, but that he never saw them together on a social basis.

DID THE TRIAL COURT ERR IN ITS DETERMINATION OF NON-PATERNITY
Considering the testimony of the above individuals, we find that the trial court was not presented with any concrete evidence to show even a slight romantic link between the plaintiff and the defendant.
The burden of proof required of the plaintiff is to establish paternity by a preponderance of the evidence. Succession of Washington, 308 So.2d 892 (La.App. 1975). The trial court, after considering all of the conflicting testimony and after viewing the demeanor of the witnesses, concluded that the plaintiff failed to meet this burden. This court on appeal cannot disturb the trial court's findings of fact unless we find that the trial judge committed manifest error. Canter v. Koehring Co., 283 So.2d 716 (La.1973).
The trial court determined that defendant's version of the facts was the more credible one. The defendant was able to produce a witness who placed him in San Francisco on one of the days of the alleged intercourse. Defendant was also able to produce two witnesses that supported his contention that he had a vasectomy performed on April 7, 1979. The testimony of Dr. Jacobs showed that defendant had negative sperm counts prior to the alleged dates of intercourse with the plaintiff. Dr. John Linder testified that defendant had a negative sperm count subsequent to the alleged time of intercourse. Dr. Hegre testified that according to one type of blood test, defendant was not the father of the child. Finally, defendant never did acknowledge in any way the child born to the plaintiff. These facts strongly support the trial court's findings of non-paternity.
As further support, the defendant, in his brief, refers to the extensive history of health disorders of plaintiff. While the plaintiff's medical records are suggestive of emotional "problems" experienced by her, we note that the trial judge did not refer to these "problems" in his Reasons for Judgment. The trial judge failed to find a direct correlation between the plaintiff's health problems and the issue of paternity. We agree with his finding and in view of our holding below find it unnecessary to delineate the long medical history of the plaintiff.
Support for plaintiff is found solely in her testimony and in the testimony of Dr. Leslie R. Bryant, Jr. and Robert Doud. It is obvious from the record that the credibility of Robert Doud was highly questionable. The trial judge obviously and properly did not give much weight to his testimony. Dr. Bryant's results are another matter and cannot be lightly dismissed, particularly due to his impressive credentials and scholarly testimony. However, given the conflicting testimony of Dr. Hegre and the fact that the plaintiff could not affirmatively show a romantic connection between herself and the defendant, we cannot say that the trial judge committed manifest error in making his decision.

PROCEDURAL ASSIGNMENTS OF ERROR
During the trial, plaintiff made a motion for the court to allow her to perform the same type of immunoglobulin tests that were done by Dr. Hegre. The court allowed her to have the test performed if the defendant would submit his blood. Defendant, however, refused to submit to the blood test. Plaintiff argues that the trial court erred in denying her motion to compel defendant to take the test.
The Uniform Act on Blood Tests to Determine Paternity, enacted in Louisiana under *1149 Revised Statute 9:396, provides as follows:
Notwithstanding any other provision of the law to the contrary, in any civil action in which paternity is a relevant fact, or in an action en desaveu, the court, upon its own initiative or upon request made by or on behalf of any person whose blood is involved may, or upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests. If any party refuses to submit to such tests, the court may resolve the question of paternity against such party or enforce its order if the rights of others and the interests of justice so require.
Prior to trial, defendant's counsel filed a Motion to Perform Blood Test to Establish Paternity and requested the court to order a hematologist to perform blood tests on defendant, plaintiff and the minor child. This motion was granted by the court and the blood tests were performed pursuant to the order. Because this order included defendant, this court is of the opinion that there was compliance with LSA-R.S. 9:396. Plaintiff's counsel had access to defendant's blood at that time to perform whatever tests she believed necessary. Defendant cannot be forced to submit to further testing of his blood as often as opposing counsel desires. We can find no error in the trial court's action denying plaintiff's Motion to Compel.
After the trial, but prior to judgment, plaintiff filed a Rule to Show Cause why the testimony of Dr. Hebert Poleski should not be admitted into evidence. His testimony was to include his findings on immunoglobulin series tests which he performed on the plaintiff and the minor child. According to plaintiff, this testimony would prove that Dr. Hegre's findings on the same immunoglobulin series tests were erroneous and could not be scientifically substantiated. This motion was denied by the trial court and plaintiff argues that the trial court erred in not allowing this testimony.
In the absence of a clear abuse of discretion, it is not error for a trial judge to refuse to reopen a case for additional evidence. Skipworth v. McElroy Metal Mill, Inc., 353 So.2d 1069 (La.App. 2nd Cir.1977).
To justify the granting of an application to reopen a case, prior to rendition of judgment, it must clearly appear that the applicant has used every effort within his means to procure the evidence before trial and, if there is doubt on the subject, it is to be resolved against the applicant. Richey v. Swink, 4 So.2d 749 (La.App. 2nd Cir. 1941).
There was sufficient opportunity to have Dr. Poleski conduct tests in order for him to testify as to the results during the trial, and even if he had, this court does not believe that the testimony of Dr. Poleski would have been sufficient to bring about a different result in the outcome of the trial.
Plaintiff further argues that the trial judge erred in not allowing her to cross-examine Dr. Sharon Doud, a witness she had called to the stand in her case-in-chief, and in not allowing Robert M. Doud to testify to any facts which would impeach Sharon Doud.
Plaintiff bases her contention on La.C. C.P. art. 1634 which states:
"Any party or his representative may be called as a witness and cross-examined by the adverse party without the latter vouching for his credibility, or being precluded from impeaching his testimony, and immediately thereafter the witness thus called may be examined or cross-examined to the extent otherwise permitted by law upon the subject matter of his examination in chief by such adverse party. The court may permit the recall and further cross-examination of the party or of his representatives as often as it deems such action to be in the interest of justice. `Representative' as used in the paragraph above and in Article 1428(2) means an officer, agent or employee having supervision or knowledge of the matter in controversy, in whole or in part, whether or not he is in the employ of or connected *1150 with the party at the time his testimony is taken."
We do not agree with the plaintiff's position that Dr. Sharon Doud was a representative or agent of defendant which would allow her to invoke the use of this article. Neither their relationship of physician-patient nor as friends creates such a bond or agency as required.
When there is no indication that counsel has been surprised or dealt with hostility by a witness during direct examination, counsel is not entitled to impeach his own witness. State v. Redwine, 337 So.2d 1041 (La.1976). Plaintiff's counsel failed to make any showing of surprise or hostility in Sharon Doud's testimony. Plaintiff called Sharon Doud as her own witness and is thus bound by her testimony. Thus we conclude that the trial court was correct in not allowing her to impeach that testimony.
Plaintiff further argues that the trial court erred in not allowing the rebuttal testimony of Dr. David deJongh and Dr. Tom Lane.
Plaintiff called Dr. David deJongh as a witness during her case on rebuttal, informing the court that the testimony of Dr. Hegre cast serious doubt on the reliability of the HLA testing. Dr. deJongh was to be presented as an HLA specialist to evaluate HLA testing and to rebut Dr. Hegre's testimony. The trial court held that Dr. deJongh's testimony would be repetitious because Dr. Bryant had conducted the HLA test and had testified as to his findings in the case-in-chief. The court stated that it would only allow an expert in the field of immunology to rebut the testimony of Dr. Hegre, and found that Dr. deJongh was not qualified as such. However, the court informed the plaintiff that she could call Dr. Bryant back to testify to reaffirm his findings.
La.C.C.P. art. 1631 states in pertinent part:
"The court has the power to require that the proceedings shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at the trial, so that justice is done."
The admission of rebuttal evidence is largely within the discretion of the trial judge. Baltzar v. Missouri Pacific Railroad, 406 So.2d 324 (La.App. 3rd Cir.1981).
The proffer made by plaintiff's counsel as to what Dr. deJongh would say if allowed to testify is exclusively concerned with the HLA testing. This material is either repetitive of Dr. Bryant's testimony or information within Dr. Bryant's expertise in the field of paternity. Nevertheless, upon examination of the proffered testimony, we conclude that based on the evidence in the record, the trial court would have reached the same conclusion had Dr. deJongh testified. Thus, we find that the trial court did not abuse its discretion by refusing to allow Dr. deJongh's rebuttal testimony.
Dr. John Thomas Lane was also called to the stand by plaintiff's counsel during rebuttal in an effort to rebut Dr. Hegre's testimony. The court refused to recognize him as an immunologist and would not allow him to testify. For the same reasons expressed above, we conclude that the trial court did not abuse its discretion in refusing to allow Dr. Lane to testify on rebuttal.
Accordingly, we affirm the decision of the trial court dismissing plaintiff's suit. All costs of this appeal to be borne by plaintiff.
AFFIRMED.