ARMSTRONG, Judge.
Plaintiff, D.M.J., appeals the trial court’s judgment dismissing her paternity suit against defendant, B.G.B.
Plaintiff and defendant were friends who worked together at Gemelli’s. There are no allegations that they ever dated each other or were romantically involved.
On June 11, 1986, plaintiff filed this paternity suit and requested that defendant participate in blood tests authorized by La. R.S. 9:396 et seq. This case was tried beginning the first week of November, 1987.
Plaintiffs testimony was that sometime after twelve midnight, on the morning of November 25, 1982, she engaged in sexual relations with defendant at his home. As a result of their sexual relationship, she became pregnant. When she informed defendant of the pregnancy he suggested abortion counselling and accompanied her to counselling. On July 20, 1983 she gave birth to a baby boy, a few weeks pre-term, whom she named R.J. Defendant admitted that he and plaintiff were together on the night in question but denies ever having intercourse with plaintiff. He claims to have accompanied her to counselling only as a friend. He denies ever acknowledging that her minor child is his son.
Numerous other witnesses were called to testify by both parties. Both parties rested on December 22, 1987. On its own motion, the trial court re-opened the case for additional testimony by an expert witness, Dr. Critty Hymes, on the length of a woman’s menstrual cycle. Additional testimony was heard on February 5, 1988. On March 16, 1989, the trial court rendered judgment in favor of defendant finding that plaintiff was incapable of conceiving on the night in question and that she had numerous and indiscriminate sexual relations around the time of conception. It assigned written reasons.
In plaintiff’s first assignment of error she argues that the trial court erred in dismissing her case because the evidence of defendant’s paternity is overwhelming. Furthermore, she argues that it was manifest error for the trial court to find that she was incapable of conceiving on November 25, 1982 and that she had numerous and indiscriminate sexual relations around the time of conception.
In the trial court’s reasons for judgment it rejected plaintiff’s allegations that her last period began on November 10, 1982 which conveniently set her period of ovulation on the one night she and defendant engaged in sexual intercourse. The trial court found that this allegation was not consistent with the other evidence in the case regarding her menstrual cycle.
There is some question as to when plaintiff’s last period began. Dr. Kushner’s records reflect that plaintiff’s last period started on November 10th, however he placed a question mark beside this date. Plaintiff’s previous period began on October 1st which would indicate a forty day menstrual cycle. Plaintiff testified that her periods were regular, 28-30 days.
The crucial date here is not when plaintiff’s last period started but when she conceived. Assuming that she had a 28-30 day cycle, plaintiff’s last period would start around November 1, 1982. If plaintiff’s period began on November 1, 1982, then, Dr. Kushner testified, he would not expect her to become pregnant by an act of intercourse on November 25, 1982. Dr. Hymes testimony corroborated Dr. Kushner’s conclusion that plaintiff would not be ovulating on November 25, 1982 if her last period began November 1, 1982.
The experts suggested that if plaintiff had a 28-30 day menstrual cycle, as she alleged, it was more likely that she would have ovulated on October 14th, 15th and 16th and again on November 14th, 15th and 16th. The trial court could have concluded from the evidence presented by both parties that plaintiff had sexual intercourse with Chris Cross, Dan and Tom Teach-worth, Ward Stallings and Paul Chip Klein during these periods of ovulation. This would account for the trial court’s finding that she had numerous and indiscriminate *539 sexual relations around the time of conception.
The trial court was faced with much conflicting testimony. This case was especially difficult because so much of the testimony was derived from the closest and most personal friends of the parties. Typically there are no witnesses to intimate liaisons. Therefore we do not envy the trial court its responsibility of filtering through the contradictory testimony that was presented. Having made what is obviously a credibility determination regarding plaintiff’s sexual relations around the time of conception, we are obliged to give the trial court great deference.
Dr. Bryant, the court’s expert in examining blood samples for inherited characteristics, testified that blood tests cannot prove paternity to an absolute certainty, so it has to be a probability. Testing did conclude that defendant could not be excluded as the father of R.J. because he had all the obligatory genes required to father R.J. Based on the tests he performed, Dr. Bryant calculated that there was a 99.60% probability that defendant was the father of R.J.
Dr. Elston, an expert in paternity testing offered by defendant, challenged Dr. Bryant’s calculation. Dr. Elston stated that the calculation was in error because Dr. Bryant failed to use 1) a margin of error and 2) a reliable sample for random man. Dr. Elston also devoted some time to distinguishing between the “relative chance of paternity” as opposed to the “probability of paternity.”
This distinction is significant because there appears to be much dispute over the use of paternity testing. Allegations exist that courts have misinterpreted the experts’ calculations in paternity testing. Quoting Ellman and Kaye, “Probabilities and Proof: Can HLA and Blood Grouping Testing Prove Paternity?” 54 N.Y.U.L. Rev. 1035 (1979), Professor Blakesley, of LSU’s Law School, presents the arguments.
Often a court will believe that a 97% or 99.5% figure given by the expert indicates the actual probability of paternity of this man in this case. Id. In reality, however, the percentage is not that the person before the bench, not excluded by the test, is the father. Rather, it is merely a probability of exclusion or the probability that a man selected at random from the relevant population would be excluded by the test. Id., at 1035. This is far from being the probability that this man is actually the father, although the court, unless caused not to do so, will take it as such.
Blakesley, Chapter 9, “Proof of Paternity”, in Blakesley, Parker and Wardle, Contemporary Family Law: Principals, Policy and Practice (Callaghan and Company 1988).
La.R.S. 9:397.3 reads:
If the court finds that the conclusions of all the experts as disclosed by the reports, based upon the tests, are that the alleged father is not the father of the child, the question of paternity shall be resolved accordingly. If the experts disagree in their findings or conclusions, the question shall be submitted upon all the evidence.
Considering the disagreement between the experts, it was within the trial court’s discretion not to place greater reliance on Dr. Bryant’s probability of paternity and to decide this case in light of other evidence.
II
Plaintiff suggests that because of the trial court’s delay in deciding this ease the judgment was rendered based on the written record as opposed to live testimony. Therefore she insists the standard of review is something less than manifest error.
There is nothing to suggest that the lengthiness of this trial adversely affected the trial court’s knowledge, recollection or appreciation of the evidence. Quite simply, the evidence brought forth at trial consisted of many contradictions. In Rosell v. Esco, 549 So.2d 840 (La.1989), the Supreme Court wrote:
A Court of Appeal may not set aside a trial court’s or a jury’s findings of fact in the absence of "mainfest error” or un *540 less it is “clearly wrong,” and where there is a conflict in testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
(Emphasis added.) Furthermore, we would still be obliged to apply the manifest error standard of review if the evidence consisted solely of written reports, records and depositions. Virgil v. American Guarantee & Liability Insurance Company, 507 So.2d 825 (La.1987).
Ill
Plaintiff insists in the absence of this court reversing and rendering a judgment of paternity it should reverse and remand for DNA paternity testing.
Plaintiff relies on La.R.S. 15:441.1 which codifies the use of DNA, blood, and saliva testing as relevant proof in establishing the offender of a crime in conformity with the Louisiana Code of Evidence.
This court has previously considered the issue of DNA testing in plaintiffs motion to compel the same which was denied. No civil counterpart to La.R.S. 15:441.1 has been enacted in Louisiana. Furthermore, defendant argues that the reliability of DNA paternity testing has yet to be substantiated. He cites several cases and articles which have struck blows to the reliability of DNA testing procedures. People v. Castro, 144 Misc.2d 956, 545 N.Y.S.2d 985 (1989); “Crimes, Misdemeanors and Molecules” MD, March 1990, p. 41; “Some Scientists Doubt the Value of ‘Genetic Fingerprint’ Evidence”, New York Times, January 1990, Sec. A; “DNA Fingerprinting for Forensic Identification: Potential Effects on Data Interpretation of Subpopulation Heterogeneity and Band Number Variability”, American Journal of Human Genetics, February 1990; Minnesota v. Schwartz, 447 N.W.2d 422 (Minn.1989).
Finally, defendant argues that having once submitted to blood tests which were inconclusive, he should not have to be subjected to giving blood again. O’Bannon v. Azar, 435 So.2d 1144 (La.App. 4th Cir.1983) writ denied, 441 So.2d 749 (La.1983). He argues that DNA testing is not so new that plaintiff could not have requested it at trial.
DNA testing would constitute new evidence. It is hornbook law that the Courts of Appeal may not consider evidence which was not previously introduced in the trial court. Leger v. Delano Plantation, Inc., 350 So.2d 377 (La.App. 3d Cir.1977). Therefore, whether or not DNA testing is reliable, admissable or appropriate is not for this court to decide.
For the foregoing reasons the judgment of the trial court is affirmed.
AFFIRMED.